Thomas Smith **MATHES, III, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 09–86–190–CR.**

Court of Appeals of Texas,
Beaumont.

Feb. 1, 1989.

Rehearing Denied Feb. 22, 1989.

Joseph D. Libby, Houston, for appellant.

Mary Ann Turner, Conroe, Thomas D. Glenn, Houston, for appellee.

## OPINION

BROOKSHIRE, Justice.

Thomas Smith Mathes, III, revisited. *See Ex parte Mathes*, 755 S.W.2d 161 (Tex. App.—Beaumont 1988, pet. granted). Appellant was convicted by a jury of the offense of capital murder of Debra Davis. The evidence tended to demonstrate that Debra Davis cohabited with one John Vandiver. Vandiver was also murdered on the same evening or night. Appellant was indicted for capital murder as to each killing. In the indictment on the death of Ms. Davis, three co-defendants were named. A severance was ordered by the trial court which resulted in a separate trial for Appellant.

The jury convicted Appellant of capital murder. The jury at the punishment stage answered certain special issues.

Special Issue Number 1: "Whether the conduct of the defendant that caused the death of the deceased was committed deliberately and with reasonable expectation that the death of the deceased or another would result? Answer yes or no; answered 'Yes'."

Special Issue Number 2: "Whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society; answer yes or no; answered 'No'."

The co-defendants named in the indictment were Cecil Rudolph Covington, Jr., Dennis Derias Holland, Jr., and Joseph Bryan Ma-

kosky. In substance, the indictment charged the four with intentionally causing the death of Debra Davis by shooting her with a firearm *and cutting her with a knife* while in the course of committing and attempting to commit robbery against John Vandiver and Debra Davis. The judgment and sentence of the court was that Appellant would be confined for life. The Appellant presents his appeal on six points of error. The first point of error is worded: "The trial court erred in allowing inadmissible double hearsay which allowed a witness to tell the jury what another witness said the Appellant said about the crime."

### Deputy Renfroe's Testimony

Deputy Renfroe testified as to the amount of money that had been reportedly taken from the residence of Vandiver on the night of the homicides; the manner or mode of dress of Debra Davis and the fact that Miss Davis had not been sexually assaulted. Renfroe had received this information from one Michael Charbeneau. Charbeneau in turn had learned this same information from the Appellant, Tom Mathes, III. Renfroe further stated that according to Charbeneau, there had been a conversation between Appellant and Charbeneau in which Appellant reportedly had detailed in depth the events of the night of the homicides. At trial the court overruled the objection based on hearsay stating that the purpose of the trial court's ruling was to establish the probable cause for the issuance of certain arrest warrants.

■ Decisional precedents firmly establish that a reversal does not result when hearsay testimony is admitted before the jury unless the accused can show that he was harmed. *Perez v. State*, 678 S.W.2d 85 (Tex.Crim.App.1984). More importantly, the rule has been well recognized that improper admission of evidence does not constitute reversible error if the same facts and evidence were proved by another witness and no objection was made to the later evidence relevant to the same facts. *East v. State*, 702 S.W.2d 606 (Tex.Crim.App. 1985); *Boles v. State*, 598 S.W.2d 274 (Tex. Crim.App.1980).

## Charbeneau's Testimony

Michael Charbeneau testified at length. He knew the Appellant and identified the Appellant in the courtroom at the trial. Charbeneau had met the Appellant at his former employer, Freight Services International located on Greens Road. Charbeneau had known the Appellant for approximately two years. They had become friends. Charbeneau, in fact, had moved in with the Appellant and the Appellant's girl friend.

Charbeneau testified that the same evening after the Appellant had been questioned by Detective Renfroe he and the Appellant were riding in Appellant's car. Appellant was driving. First, they discussed a certain .38 caliber pistol that Charbeneau had purchased for his own protection. Then, their conversation progressed and Appellant narrated fully the events and facts of the two homicides. Appellant said in substance that he was going to shoot Vandiver in the shoulder and the hip to begin and thereby make Vandiver tell Appellant where the money was. Also, Appellant stated that Cecil, Dennis and Joe were at the scene. Appellant further stated that Vandiver was lying on his belly in a pool of blood when Vandiver finally told Appellant where the money was located. Vandiver kept on begging for his own life. Appellant stated that the events had not gone exactly the way they were planned. Charbeneau, from the conversation with Appellant, had the understanding that Dennis had slashed the throat of Debra Davis because she was making too much noise. Appellant told Charbeneau the narrative of facts leading to Davis' death. Appellant stated that Debra was wearing only a robe and she was lucky that she wasn't raped. Appellant told Charbeneau that he (Mathes) had obtained $40,000 in money from the residence of Vandiver. Appellant had also obtained cocaine from the residence.

Prior to this conversation, Charbeneau, who was a stranger to the two killings, had read about the events and the details of the double murders as reported in the newspapers day by day. From the daily newspaper accounts, Charbeneau had learned that at the residence in question there was discovered 283 uncut grams of cocaine, $13,000 in cash, and two sixty pound bails [sic] of marihuana. Upon pondering these newspaper reports, Charbeneau, who took no part in the killings and knew nothing of them until later, then mentioned these facts to Appellant, telling Appellant that it was stupid to leave that stuff. Appellant responded that by leaving the cocaine, the $13,000 in cash, and the two sixty pound bales of marihuana it would throw the police off the trail. Appellant also stated during the conversation that he had told and ordered Dennis to shoot John Vandiver. Appellant, towards the end of the conversation with Charbeneau, said that he had forgotten his wallet at the Vandiver residence and had to return to the decedent's residence to retrieve his wallet on the same night. The conversation concluded with Appellant telling Charbeneau that Cecil Covington, Jr., Dennis Holland, Jr., and Joe Makosky had all been involved in the murders and that they were all at the scene of the killings.

The conversation summarized above was admitted before the jury without objection. This evidence was clearly admissible since these statements were made by the Appellant himself to Charbeneau. These statements were certainly admissions and admissions against interests. As well, they were admissions by Appellant being a party-opponent. *TEX.R.CRIM. EVID. 801(e)(2)(A)*. In fact, Rule 801 *declares that admissions by party opponents* (which are admissions and statements offered against that party and the admissions or statements are made by him personally and in his own individual capacity) are declared not to be hearsay. In view of Charbeneau's testimony the brief and very generalized summary of events given by Deputy Renfroe could not have caused harm. No harm is shown and no error is demonstrated; certainly no reversible error is present. Charbeneau's testimony, in effect, virtually amounted to a full, non-custodial confession by Appellant. Appellant was at liberty driving his own vehicle. Appellant was not in the presence of any

officer of the law. Appellant confessed his guilt fully to a private citizen. Point one is overruled.

### Sarah Irwin's Testimony

Appellant's second point of error contends that the trial court erred in failing to declare a mistrial when the State elicited hearsay testimony that the deceased, John Vandiver, claimed to have over $40,000 in his possession just prior to the killings. The Appellant's brief argues *that a defensive theory of the case* was that Vandiver was a dope dealer and that he and Debra Davis were killed in a dope deal that had gone wrong and hence, not in the course of a robbery. The Appellant's brief candidly states that large sums of money and a huge quantity of marihuana as well as other illegal substances were found in the Vandiver residence. An accomplice witness, Dennis Holland, Jr., swore that the four involved took over $40,000 from Vandiver's residence after the two killings.

Sarah Irwin was a witness for the prosecution. She testified that one evening she did not pay for her meal because she simply had no cash. She had been dining with John and Debra. She stated that she told John and Debra that she didn't have any money. John replied that that would be no problem. John said in substance that he had plenty of money "almost $42,000 on me" and he [John] sort of chuckled. The next question asked by the State was when John made that statement about having the $42,000 on him, did John point towards anything. This question was not answered. There was an objection at this point that the answer would be hearsay. The trial court sustained that objection and instructed the jury to totally disregard it. The State, however, took the position that the testimony *demonstrated a present sense impression on the part of Vandiver.* The rules on the granting of a mistrial are well established. The court's instructions to the jury to disregard and the court's ruling sustaining the objection were, under this record, amply sufficient to cure any harm. Error in the admission before the jury of improper testimony is routinely cured by the trial court's instructions, clear and unequivocal, directed to the jury to disregard the testimony and challenged questions. Only in extreme cases where it is obvious that the *testimony was definitely calculated to inflame the minds of the jurors and did so inflame the minds of the jurors* and that the testimony was of such a character that the attempted withdrawing of the impression, if any, produced on the minds of the jury members would necessarily be an impossibility, result in the necessity for granting a motion for mistrial. *Thompson v. State,* 612 S.W.2d 925 (Tex.Crim.App.1981); *Campos v. State,* 589 S.W.2d 424 (Tex.Crim.App.1979). *See Bagley v. State,* 708 S.W.2d 585 (Tex.App.— Beaumont 1986, pet. granted). We have read the testimony on this point from Ms. Sarah Irwin, a friend of both the victims. She had dined with them several hours before the victims were killed. We determined that the jury was not inflamed by the single statement of John Vandiver concerning the $42,000 in his possession. A co-defendant, Dennis Holland, Jr., as well as another witness, Charbeneau, testified that Appellant's plan was to shoot Vandiver in a certain manner and to wound him and make him disclose where his large sum of money was stashed or hidden. The fact that Vandiver had a large sum of money on his person would not inherently inflame the jurors' minds or thereby unfairly and unreasonably visit prejudice upon this Appellant. This statement concerning Vandiver's possession of the $42,000 does not reveal any type of extraneous offense or offenses nor does it in anywise tend to show in and of itself that the Appellant was of a bad moral character. We decide that when the trial court below sustained the objection and strictly instructed the jury to disregard this testimony that the trial court's actions resulted in effectively curing any harm. The trial court's rulings and statements were sufficient.

Furthermore, *TEX.R.CRIM.EVID. 803,* in relevant part, provides:

"The following are not excluded by the hearsay rule, even though the declarant is available as a witness:

"(1) *Present sense impression.* A statement describing or explaining an event or condition made while the declarant was perceiving the event or condition or immediately thereafter.

. . . .

"(3) *Then existing mental, emotional, or physical condition.* A statement of the declarant's then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, or bodily health), . . . ."

We perceive that Vandiver's statement of his possessing $42,000 actually on his person comes easily within the purview of Rule 803. Vandiver was explaining his actual present financial status and condition as he stated it to be at that time. And Vandiver was making a statement of his then existing state of mind as to his plan and motive to pay the dinner check. Vandiver's statement was admissible. No error, no harm, is shown.

An independent and additional reason for overruling this second point of error is that the Appellant's motion for mistrial was untimely and late. *TEX.R.APP.P. 52(a).* Appellant's point of error number two is overruled.

### Texas' Exhibit No. 101

■ The third point of error contends that State's Exhibit No. 101 was not admissible as a prior and consistent statement of Dennis Holland, Jr. State's Exhibit No. 101 was a handwritten statement given by Holland to his own personal attorney prior to the trial of Appellant. This statement was properly admitted into evidence during the State's re-direct examination of Holland. It was in fact a prior consistent statement. This practice and admissibility is authorized by *TEX.R.CRIM.EVID. 801(e)(1)(B).* This statement in the form of an exhibit was placed into evidence on a re-direct examination of Holland by the prosecution. It was shown to be a prior, consistent statement in conformity to Rule 801(e)(1)(B). Again it is important to note this Rule 801 declares such a *statement is simply not hearsay.* If the prior statement by the witness is consistent with his testimony on the stand and is offered to rebut an express or implied impeachment against him of some sort of recent fabrication or improper motive or improper influence (raised during the cross-examination) then the prior, consistent statement is admissible evidence.

The Court of Criminal Appeals has decided in substance that where a witness has been impeached by showing that he had made other or different or incomplete statements in regards to certain matters or facts than those about which he testified to on the trial, he can then be supported and sustained by showing that he made prior, consistent statements and could be thereby rehabilitated. *Rains v. State,* 146 S.W.2d 176 (Tex.Crim.App.1940).

■ During the course of the investigation of the double murders, Dennis Holland, Jr., had given a written statement to a detective. On September 3, 1985, Dennis Holland, Jr., had given this same typewritten statement to a Detective Bill Schroeder. Immediately before the typewritten statement Holland had been taken before District Judge Jim Keeshan, a magistrate in Montgomery County, who read in detail all the rights of Holland to him. The prior handwritten statement had been made and delivered in February of 1985. The typewritten statement was given to Detective Schroeder about seven months after the killings. The Appellant's attorney trial strategy was to place major reliance on the fact that in this typewritten statement certain facts were omitted from the facts to which Holland testified at the trial. One of those omitted facts that was stressed was that the *Appellant had planned to murder Vandiver and his girl friend, Debra Davis, if she were present.* Another omitted set of facts (in the typewritten statement) was that Holland and Makosky were to go along to help bury the bodies. They were the planned burial detail. The September 1985 typed statement was used as an effort to impeach Holland. This stratagem was to attempt to impeach and discredit Holland's testimony and further to create the impression that Holland's verbal

testimony from the stand at the trial on the merits *was of recent fabrication.* Hence, State's Exhibit 101, which was Holland's handwritten statement of February 1985, was properly admitted to rebut this impression.

There are certain references to the record that are set out in question and answer form verbatim in the brief filed by the State. In each case the State has made a reference to the record as: record, period, roman numeral, capital letter, dash, page number; e.g., R.VA–169; indicating there is a volume of the Statement of Facts referred to as VA, followed by references to specific pages thereof. In each case we have found the exact testimony referred to, but in our record volume VA extends only to 124 pages. Therefore, it is helpful to both parties on further appeal and helpful to the Court of Criminal Appeals for us to state that we have found the exact same testimony in Volume 9 at pages 52, 53; Volume 9, pages 66 and 67; and Volume 9, page 58. The testimony quoted in the State's brief is as follows:

"Q [By Ms. Turner] When did you first tell anyone about those facts?

"A [By Dennis Holland] I told my attorney—my attorneys prior to the plea bargaining agreement.

"Q In what form did you do that—did you tell your attorneys?

"A Verbally and a couple of weeks after that I sat down and wrote another written statement that I gave to my attorney.

"Q Did you do that before you were ever interviewed by anyone from the District Attorney's Office?

"A I did.

"Q I am going to ask you to study State's 101 and ask you if you can identify what that instrument is.

"A This is the statement that I wrote out and gave to my attorneys.

"Q And this appears to be a true and correct copy of that statement, is that correct?

"A Yes, it is.

"MS. TURNER: The State would offer State's Exhibit 101.

"MR. HALL: Your Honor, when Mr. Holland testified before, we were given a copy of what I thought were his statements. I don't recall ever seeing a copy of this statement.

"MS. TURNER: That is true, Your Honor. I just received it this week from Mr. Hill and I could not go into that with Mr. Hall.

\*　　\*　　\*　　\*　　\*　　\*

"Q [By Ms. Turner] I believe that we left off when you were being asked when you first told anyone that the robbery and murders were planned. When did you first tell anyone about that?

"A [By Dennis Holland] I told my attorneys just prior to the time that I entered my agreement.

"Q All right. And do you recall when you met with the District Attorney's Office after the plea bargain agreement was entered into?

"A February 13th.

"Q And before February 13th, did you have an opportunity to write down what you had told your attorneys previously?

"A Yes, I did.

"Q And when had you written that statement?

"A It was about the first week of February.

"Q Who did you give that statement to?

"A My attorney, Wayne Hill.

"Q When did you give it to your attorney, Wayne Hill?

"A The morning of February the 14th, just prior to the meeting.

"Q I'm sorry?

"A February the 13th.

"Q Is your attorney in the courtroom with you today?

"A Yes, he is.

"Q Would you point him out for the jury?

"A (Witness complies.)

"Q Did he furnish the District Attorney's Office a copy of that statement on that day?

"A No, he did not."

Mr. Hill, Holland's personal attorney, testified to the following as to why Holland's handwritten statement had not been provided to the State prior to Holland testifying:

"Q [By Ms. Turner] Why had you not given me a copy of State's Exhibit No. 101 prior to Monday?

"A [By Mr. Hill] Well, at that time, at the time that Dennis and I got together the first time on February 13, 1986, he had already prepared a written statement and provided it to me in anticipation that you wanted to secure a written statement from him. As a result of you not asking for a statement on that day, I just retained it in my possession.

"Q Did you consider it as part of the attorney-client privilege at that point?

"A Yes, I did."

The record shows that the handwritten statement was given by Dennis Holland, Jr., to his own attorneys even prior to any plea bargaining agreement. The record further shows that this handwritten statement given to his own attorney by Holland was before Holland was even interviewed by anyone from the district attorney's office. In fact, Holland reaffirmed more than once that he had advised his attorneys and given his attorneys the handwritten statement prior to the time that he entered into any plea bargaining agreement negotiation with the prosecution.

A Mr. Wayne Hill was the attorney for Dennis Holland, Jr. He had not furnished to the district attorney's office a copy of the February 1985 statement. Attorney Hill testified that before the first time Hill and Holland had gotten together that Holland had already prepared a handwritten statement. This was done apparently in anticipation of the prosecution's probable desire to secure a written statement from Holland. But Attorney Hill testified in substance that since the prosecution had not asked for a statement on the day of plea negotiations that he, Mr. Hill, simply retained the statement in his file and in his sole possession. Attorney Hill considered the handwritten statement as a part and parcel of the attorney-client privilege at that particular time. *We definitely con-*

*clude that Holland had privately told his own attorney about the said murders having been planned by Appellant and that he wrote out his statement, identified as State's Exhibit 101, prior to being interviewed by the State and before any plea bargain negotiations was even discussed with the prosecution.*

Thence, logically Holland was not induced to write his statement with the thought of obtaining leniency. Logically the State was not induced to recommend a sentence of sixty years based on Holland's statement simply because the State was not aware that this particular handwritten statement was in existence, it being a private, confidential statement to Attorney Hill. The State did not know its contents. We determine that State's Exhibit No. 101 was properly admitted as a prior, consistent statement under this factual background.

State's Exhibit No. 101 clearly pointed out that "Tom", referring to Appellant, had drawn a picture or plat of John Vandiver's place out in the country on a piece of paper and Appellant described everything around the residence in detail. Appellant had said that Joe and Dennis was going to be let out of the van a few blocks from the house and they were going to circle around to the back of a fence behind Vandiver's house and wait for a signal from Cecil Covington, Jr., before Joe and Dennis could come up to the house. Exhibit 101 also revealed that in the meantime Appellant was going to go into John's house to pretend to buy some "pot" off John. Cecil was going to wait in the van for a signal or word from Appellant. Later, John was to be killed. Appellant also said that if John's "old lady" is home, he would kill her, too. State's Exhibit 101 says: "That was Tom's plan, he said that Joe and I had burial detail. [h]e wanted us to take the bodys out in the woods and bury them." There was no error in admitting State's Exhibit No. 101. Error three is overruled.

### The Nature and Quality of the Evidence

◼ Appellant's point of error four charges that the evidence is insufficient to

sustain the verdict because the accomplice witness' statement is not corroborated by trustworthy evidence. The Appellant argues that this case boils down to two essential witnesses, Holland and Charbeneau. In the process of reviewing the sufficiency of the evidence the Court of Criminal Appeals has recently held that the standard to be applied is whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. The evidence must be viewed in the light that is most favorable to the verdict. *Lincecum v. State*, 736 S.W.2d 673 (Tex. Crim.App.1987), cert. den'd, —— U.S. ——, 108 S.Ct. 2835, 100 L.Ed.2d 936 (1987); *Moreno v. State*, 721 S.W.2d 295 (Tex. Crim.App.1986); *Houston v. State*, 663 S.W.2d 455 (Tex.Crim.App.1984). Certainly, the co-defendant Holland's evidence presented by the State was the primary evidence against the Appellant. The Appellant does not challenge Holland's veracity or his version of the facts. Appellant does not assert that Holland's testimony is deficient as to any one of the elements of capital murder. The attack made by the Appellant is on the credibility of the witness Charbeneau. Charbeneau's testimony was relied upon by the State in part to corroborate the testimony of Holland. The Appellant advances the concept, by way of argument, that if Charbeneau's testimony is not credible, then it cannot stand as corroborative of Holland's testimony.

The main thrust of the attack on Charbeneau's credibility was that he had a motive to fabricate his testimony in order to receive a $10,000 reward. In connection with the reward theory, Charbeneau testified that after a month had passed subsequent to the murders, he moved from the Appellant's home and lived at another place. Several more months passed. At this time Charbeneau opened up to John Reynolds, his roommate, and eventually told Reynolds everything that he [Charbeneau] knew about the murders. These conversations and revealing narratives told to Reynolds took place before Reynolds advised Charbeneau that a reward was being offered. After learning of the reward Charbeneau approached the authorities and revealed to

them what he knew about the Vandiver–Davis killings. Charbeneau swore that the same facts that he told before the jury in open court were the same facts that he had narrated to Reynolds before he knew of a reward and had retold to the authorities. Charbeneau further stated that as of the date of his testimony he had not received any reward money and he also testified that as far as he was concerned he really didn't care if he got any reward money or not. He also stated without equivocation that during his several interviews with Deputy Renfroe and with certain representatives of the district attorney's office that no one had suggested or advised him to swear to a particular set of facts other than the true facts. Charbeneau's believability was for the jury to decide.

*TEX. CODE CRIM.PROC.ANN. art. 38.-14* (Vernon 1979) concerning the testimony of an accomplice clearly states that while a conviction cannot be had upon the testimony of an accomplice alone, nevertheless, if the testimony of the accomplice is corroborated by other evidence tending to connect the defendant with the offense committed, then the conviction can stand. Charbeneau's testimony did more than merely tend or trend to connect Mathes with the offense committed. And certainly, Charbeneau's testimony was more than sufficient and certainly clearly demonstrated more than the mere commission of an offense.

Charbeneau was not motivated to fabricate his testimony to Reynolds upon the expectation of receiving reward money since at that time Charbeneau simply was totally unaware of an offer of reward. Later, admittedly, Charbeneau knew of the reward money in the amount of $10,000. But the jury is the trier of fact and the jurors are the sole judges of the credibility of the witnesses and the weight to be given their testimony. The jury, by their verdict, showed that Charbeneau was a credible, believable witness as far as the jury was concerned. This function was properly for the jury to perform. We find that Holland's testimony was amply corroborated. *Carlsen v. State*, 654 S.W.2d 444 (Tex. Crim.App.1983, opinion on rehearing);

*Freeman v. State,* 654 S.W.2d 450 (Tex. Crim.App.1983, opinion on rehearing); *Denby v. State,* 654 S.W.2d 457 (Tex.Crim. App.1983, opinion on rehearing); *Wilson v. State,* 654 S.W.2d 465 (Tex.Crim.App.1983, opinion on rehearing). Appellant's fourth point of error is overruled.

Next the Appellant says that error was committed in admitting the State's Exhibit No. 101 *even if it was properly admissible as a prior consistent statement because it was a shorthand rendition of the State's case against the Appellant.* Appellant argues that this State's Exhibit 101 was like an evidence tag or an envelope which summarizes the State's case. We speedily disagree. We have discussed State's Exhibit 101 extensively above and Exhibit 101 was simply not a shorthand rendition. The Appellant argues that Exhibit 101 should be treated exactly like extraneous, informal writings or scribblings that are found on envelopes of different sizes that are used to store or contain certain tangible pieces of evidence or demonstrative or real evidence. But State's 101 simply is not an extraneous descriptive narrative or notation. Five is overruled.

█ Then, once again, in his last point of error being six, the Appellant charges that even if State's Exhibit 101 was properly admitted as a prior consistent statement then, nevertheless, the Appellant's right of confrontation under Texas law and the Texas Constitution and/or the Sixth Amendment to the United States Constitution was violated. Not so. Dennis Holland, Jr., was on the stand in person and testified at length and was cross-examined at length and he did confront Appellant. This point of error six is without merit. In fact, it was the Appellant's cross-examination of Holland that created or attempted to create an impression or inference that Holland's testimony had been either recently fabricated or improperly motivated. This cross-examination authorized the admissibility of State's Exhibit 101 and, of course, the Appellant had ample opportunity to further cross-examine Holland after his prior, consistent, handwritten statement, being Exhibit 101, was admitted into evidence. Fur-

thermore, the Appellant did not make a request at the conclusion of the State's direct examination of witness Holland for a production of any and all of that witness' written statements. Point of error six is simply not sound. It is overruled.

The judgment and the sentence of Thomas Smith Mathes, III, below is in all things affirmed.

AFFIRMED.

BURGESS, Justice, concurring.

I concur with only a minor reservation. Under point of error number two, I do not feel that Vandiver's hearsay statement comes within the purview of *rule 803.* It is, therefore, inadmissible. I do agree, however, that its admission was harmless.